UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ANTHONY RICKS,

    Petitioner,

v.

JODI DEANGELO,

    Respondent.

Case No. 19-10387
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING PETITION FOR HABEAS RELIEF [1]**

A jury convicted Robert Anthony Ricks in Wayne County Circuit Court of premeditated murder. Ricks was sentenced to life imprisonment. He appealed his conviction to the Michigan Court of Appeals, arguing that there was insufficient evidence to support his conviction. The Michigan Court of Appeals affirmed Ricks' conviction, and the Michigan Supreme Court denied him leave to appeal because his request for leave was untimely.

In 2019, Ricks petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 1.) Ricks argues that his conviction should be overturned because the circumstantial evidence did not establish (1) his identity as the perpetrator of the crime or (2) the premeditation element.

Because the Court finds that the Michigan Court of Appeals' adjudication of Ricks' claim on the merits was not contrary to or an unreasonable application of United States Supreme Court precedent, the Court denies the habeas petition.

## I.

## A.

Ricks' conviction arose from the fatal stabbing of his father-in-law, Stewart Banks, Jr. *See People v. Ricks*, No. 336498, 2018 WL 1768110, at *1 (Mich. Ct. App. Apr. 12, 2018).

Ricks was married to Mary Banks[1], Banks' daughter. (ECF No. 8-9, PageID.332 (Trial Tr. at 69 (Oct.13, 2016)).). According to Mary, she decided to separate from Ricks in January 2014, and traveled from Detroit to Baltimore to live with her parents. (*Id*. at PageID.333 (Trial Tr. at 70 (Oct.13, 2016)).) Mary testified that Ricks initially followed her to Baltimore, but the two had agreed to separate. (*Id*. at PageID.334 (Trial Tr. at 71 (Oct.13, 2016)).) Mary planned to give Ricks $75 so that he could take a bus back to Detroit, where they had an apartment. (*Id*. at PageID.334–335 (Trial Tr. at 71–72 (Oct.13, 2016)).)

Around 7 p.m. on February 21, 2014, Mary returned to her parents' house in Baltimore and noticed her father was not at home. (*Id*. at PageID.336 (Trial Tr. at 73 (Oct.13, 2016)).) She also noticed that Ricks had left and taken his keys, so she called Ricks and asked him where Banks was. (*Id*.) Ricks responded, "what does the note say[?]" (*Id*. at PageID.337 (Trial Tr. at 74 (Oct.13, 2016)).) Mary then found a handwritten note that appeared to be from her father. (*Id*.) The note said, "gone to hospital." (*Id*.) Mary then asked Ricks why her father had gone to the hospital, and

---

[1] Because the Court is referring to Stewart Banks, Jr., as "Banks," the Court will refer to his daughter as "Mary Banks" or "Mary."

Ricks said, "I know he was feeling sick." (*Id.* at PageID.339 (Trial Tr. at 76 (Oct.13, 2016)).) Other than this note, Banks testified she was not aware her father was sick, nor did she observe him being sick that day. (*Id.*) Mary also testified that during this phone call, Ricks said he and Banks went their separate ways. (*Id.*)

A detective with the Baltimore Police Department, however, saw on surveillance video that Ricks left the house with Banks that day and went to a pawn shop with him later that morning. (ECF No. 8-10, PageID.398–399 (Trial Tr. at 8–9 (Oct. 17, 2016)).). Further, cell tower records established that the two men then traveled by bus together from Baltimore to New York City later the same day. (*Id.* at PageID.404–405 (Trial Tr. at 14–15 (Oct.17, 2016)).) Banks' phone stayed in New York City through Friday evening and was ultimately tracked to Jersey City on Saturday evening. (*Id.* at PageID.407–408 (Trial Tr. at 17–18 (Oct.17, 2016)).) It appeared to follow a New York City trash truck route (thus suggesting that the phone had been tossed in the trash). (*Id.* at PageID.409 (Trial Tr. at 19 (Oct.17, 2016)).) In the same time frame, Ricks' cell phone traveled through New Jersey and Pennsylvania, and ultimately arrived in Detroit on Saturday morning. (*Id.* at PageID.407 (Trial Tr. at 17 (Oct.17, 2016)).)

After Mary spoke to Ricks on February 21, 2014, she never again heard from her father. (ECF No. 8-9, PageID.341 (Trial Tr. at 78 (Oct.13, 2016)).) Mary reported Banks missing early on February 22, 2014. (*Id.* at PageID.342 (Trial Tr. at 79 (Oct.13, 2016)).) A month later, on March 21, 2014, Joseph Fielder, a Detroit resident, discovered Banks' body in a vacant lot in Detroit. (*Id.* at PageID.301–03 (Trial Tr. at

3

38–40 (Oct.13, 2016)).) His postmortem exam revealed that Banks had been stabbed 25 times on his head, neck, back, and wrist. (*Id.* at PageID.278 (Trial Tr. at 15 (Oct.13, 2016)).) There was no identification on him (*id.* at PageID.317 (Trial Tr. at 54 (Oct.13, 2016)).), but a bank envelope found in one of his pockets led to his eventual identification through dental records. (*See* ECF No. 8-10, PageID.443–44 (Trial Tr. at 53–54 (Oct. 17, 2016)).) The doctor who conducted the postmortem exam testified he did not know when Banks died, but the body had partially-decomposed by the time it was examined. (ECF No. 8-9, PageID.298–299 (Trial Tr. at 35–36 (Oct. 13, 2016)).)

Mary testified that Ricks was evasive and changed his story more than once when she questioned him about her father's whereabouts. After Mary called the police to file a missing person report, she called Ricks again. (ECF No. 8-9, PageID.344–345 (Trial Tr. at 81–82 (Oct. 13, 2016)).) On that occasion, Ricks told Mary that he did not know where her father was and that they had gone their separate ways. (*Id.* at PageID.345 (Trial Tr. at 82 (Oct. 13, 2016)).) But in a later conversation, Ricks told Mary that he had dropped Banks off at the bus station to take the BoltBus to New York. (*Id.* at PageID.355 (Trial Tr. at 92 (Oct. 13, 2016)).) In yet another conversation, Ricks stated that he and Banks had gone to New York where they got into an argument and that Banks had told Ricks that he was going back to Baltimore. (*Id.* at PageID.356 (Trial Tr. at 93 (Oct. 13, 2016)).) In October 2014, Mary informed Ricks that Banks' body had been found. (*Id.* at PageID.358–359 (Trial Tr. at 95–96 (Oct. 13, 2016)).) At that point, Ricks admitted that he and Banks went to Detroit together, but said that Ricks' brother had killed Banks. (*Id.*) Mary also testified that, upon

4

hearing the news about her father's death, Ricks told her that some good might come from it because Ricks could then "come back home." (*Id.* at PageID.359 (Trial Tr. at 96 (Oct. 13, 2016)).)

Ricks testified in his own defense. He said that he and Banks had left the apartment together the morning of February 21, 2014, and that he knew Banks had left a note, though he did not know what the note said. (ECF No. 8-11, PageID.527 (Trial Tr. at 15 (Oct. 18, 2016)).) They both got on the BoltBus and traveled to New York. (*Id.* at PageID.529 (Trial Tr. at 17 (Oct. 18, 2016)).) In New York, according to Ricks, the two men parted ways, and Ricks took a Megabus to Detroit. (*Id.* at PageID.530–531 (Trial Tr. at 19–20 (Oct. 18, 2016)).) Ricks testified that he was going home to Detroit to see his son and to inquire about a building in Hamtramck that he wanted to turn into a charter school. (*Id.* at PageID.530–532 (Trial Tr. at 19–21 (Oct. 18, 2016)).) He also stated that he saw his brother and a woman named Tiffany while in Michigan, and that both drove with him to various schools in metro Detroit to inquire about leasing the buildings. (*Id.* at PageID.533–534 (Trial Tr. at 22–23 (Oct. 18, 2016)).) After spending a few days in Detroit, Ricks traveled back to Baltimore and saw Mary. (*Id.* at PageID.534 (Trial Tr. at 23 (Oct. 18, 2016)).) There, he told Mary again that he and Banks had parted ways at the BoltBus. (*Id.*) He then collected his things from the Baltimore house and left. (*Id.*)

Ricks denied killing Banks, knowing who killed Banks, or having any reason to kill him. (ECF No. 8-11, PageID.538 (Trial Tr. at 26 (Oct. 18, 2016)).) Ricks also

5

testified that he loved his father-in-law and there were no issues between the two of them. (*Id.* at PageID.534–535 (Trial Tr. at 22–23 (Oct. 18, 2016)).)

There were no other defense witnesses, and at the close of the proofs, the trial court instructed the jury on first-degree premeditated murder and second-degree murder as a lesser charge. (ECF No. 8-11, PageID.514, 601–605 (Trial Tr. at 2, 89–93 (Oct. 18, 2016)).) On October 19, 2016, the jury found Ricks guilty of first-degree premeditated murder (ECF No. 8-12, PageID.618), and the trial court eventually sentenced Ricks to life imprisonment (ECF No. 8-13, PageID.636).

**B.**

Ricks appealed his conviction as of right on the ground that there was insufficient evidence at trial to identify him as the perpetrator of the crime. The Michigan Court of Appeals adjudicated Ricks' claim on the merits and concluded that "sufficient evidence existed to allow a jury to determine that defendant was the perpetrator of the crime and that he murdered the victim with premeditation." *People v. Ricks*, No. 336498, 2018 WL 1768110, at *3 (Mich. Ct. App. Apr. 12, 2018). Ricks attempted to file an application for leave to appeal in the Michigan Supreme Court, but the Supreme Court rejected his application as untimely. *See* (ECF No. 8-14, PageID.644).

Ricks then filed a *pro se* habeas corpus petition in this Court in 2019. (ECF No. 1.) Ricks argues that the Michigan Court of Appeals erred in finding that there was sufficient evidence of both identity and premeditation to convict Ricks of premeditated murder. (*Id.* at PageID.2.) In response, Deangelo, the warden of the

6

prison where Ricks is incarcerated, argues that Ricks' challenge to the sufficiency of the evidence at his trial is unexhausted due to his untimely application to the Michigan Supreme Court. In the alternative, the Warden contends that the Michigan Court of Appeals reasonably rejected Ricks' claims on the merits. (ECF No. 7.)

## II.

### A.

The Court will first address the Warden's argument that Ricks has not exhausted his habeas claims.

It is clear from the record that Ricks did not raise his sufficiency-of-the-evidence claim at all levels of state-court review. *See* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus. . . shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State[.]"); *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–848 (1999) (finding that petitioner was no longer able to petition for leave to appeal to the Illinois Supreme Court because the time for filing had passed, and therefore, the claims were procedurally defaulted); *see also Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009).

However, courts may deny a habeas petition on the merits despite the petitioner's failure to exhaust available remedies in state court. 28 U.S.C. § 2254(b)(2); *see also Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) ("[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits."). Because the Court ultimately denies Ricks' habeas claims, it will proceed to address them on the merits.

## B.

The Michigan Court of Appeals reviewed these claims on the merits. Thus, deference as prescribed by The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies. And to obtain relief, federal habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' [must] show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt[.]" *Renico v. Lett*, 559 U.S. 766, 773 (2010).

The Supreme Court has held "that the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a petitioner, like Ricks, challenges the sufficiency of the evidence underlying his conviction, the Court must view the trial testimony and exhibits "in the light most favorable to the prosecution" and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009); *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018). This standard "gives full

8

play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (internal quotations omitted). "Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution." *Id.*

And because both the *Jackson v. Virginia* standard and AEDPA apply to Ricks' claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [appellate court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id.* (citations omitted). In other words, it must be the case that the Michigan Court of Appeals decision is contrary to or an unreasonable application of *Jackson v. Virginia*.

## C.

Ricks argues that the Michigan Court of Appeals' ruling is contrary to clearly-established case law because the evidence did not establish Ricks' identity as the perpetrator or premeditation beyond a reasonable doubt. (ECF No. 1, PageID.5.) The Court addresses each element in turn.

### 1. Identity

"The identity of a defendant as the perpetrator of the crimes charged is an element of the offense [of premeditated murder] and must be proved beyond a

9

reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003) (citing *People v. Turrell*, 181 N.W.2d 655, 656 (Mich. Ct. App. 1970)).

Ricks states that there was insufficient evidence that he murdered Banks. True, the record provides no physical evidence directly linking Ricks to the location of Banks' body or the crime scene, nor is there evidence showing where the crime occurred in the first instance. (*See* ECF No. 8-9, PageID.327–28.)

But the circumstantial evidence in this case makes it reasonable for the Court of Appeals to conclude that there was sufficient evidence of identity. *See People v. Fletcher*, 679 N.W.2d 127, 145 (2004) (holding that circumstantial evidence can provide evidence of identity and intent). By Ricks' own admission, he and Banks traveled together from Baltimore to New York City on February 21, 2014. (ECF No. 8-11, PageID.529 (Trial Tr. at 17 (Oct. 18, 2016)).) Although there is no testimony describing what happened to Banks after the two men arrived in New York, Banks' cell phone data shows that his phone followed a New York City trash route to Jersey City, and then abruptly stopped operating near a dumpsite at 4:58 a.m. on February 23, 2014. *See* (ECF No. 8-10, PageID.407–409 (Trial Tr. at 19–20 (Oct. 17, 2016)).). Taking this evidence in the light most favorable to the prosecution, a rational jury could infer that Banks' cell phone was thrown away in the trash in New York City, where Ricks testified he last saw Banks. So there is evidence to suggest that Ricks and Banks were together in the last place Banks was known to be alive.

And on February 22, 2014, Ricks' phone indicated that he was in Detroit, which he confirmed at trial. (ECF No. 8-10, PageID.405 (Trial Tr. at 17 (Oct. 17, 2016)); ECF

10

No. 8-11, PageID.530–532 (Trial Tr. at 18–20 (Oct. 18, 2016)).) Later that same day, Ricks' cell phone interacted with a cellphone tower which was located near both his family's home and the location of Banks' body, which was found about a month later. (ECF No. 8-10, PageID.469–470 (Trial Tr. at 79 (Oct. 17, 2016)).) The Court of Appeals thus also found that a jury, crediting, this testimony, could find that Ricks was in the vicinity of Banks' body right around the time he went missing.

In addition to the evidence putting Ricks in most of the same locations as Banks, a reasonable jury could also have credited Mary Banks' testimony that Ricks provided her with conflicting explanations when she asked about her father's whereabouts. These inconsistencies—coupled with Mary's testimony that Ricks eventually told her that he had traveled with Banks to Detroit, that Ricks' brother may be responsible for Banks' murder, and that Banks' murder could be a good thing—would allow a jury to reasonably infer that Ricks was the perpetrator of Banks' murder.

And there is evidence of consciousness of guilt. Ricks admitted to using someone else's boarding pass to board a plane. And when he was taken into custody for using someone else's boarding pass, he gave the officers a fake name. (ECF No. 8-11, PageID.555–556 (Trial Tr. at 43–44 (Oct. 18, 2016)).) The jury could have inferred from Ricks' attempt to flee that he was conscious of his guilt. *See People v. Goodin*, 668 N.W.2d 392, 396 (Mich. Ct. App. 2003) ("[E]vidence of flight is admissible to support an inference of consciousness of guilt[.]"). The jury also could have inferred consciousness of guilt from Ricks' deceptive conduct and false statement about his

11

identity. *See Unger,* 749 N.W.2d at 288 ("A jury may infer consciousness of guilt from evidence of lying or deception.").

Considering this evidence, the Michigan Court of Appeals was not unreasonable in concluding that there was sufficient evidence for a jury to find that Ricks murdered Banks. *See* 28 U.S.C. § 2254(d). The Court of Appeals relied on Ricks' inconsistent statements, where he told Mary Banks he had parted ways with her father in the morning but was later seen on video leaving the house with Banks and going to a pawn shop. *People v. Ricks*, No. 336498, 2018 WL 1768110, at *1–2 (Mich. Ct. App. Apr. 12, 2018). The Court of Appeals also relied on the cell tower evidence to find that there was circumstantial evidence "that defendant and the victim were together all through February 21, 2014, and that when the victim's cell phone stopped communicating that day, defendants continued to Detroit, where the victim's body was eventually found." *Ricks*, 2018 WL 1768110, at *2. Neither of these conclusions are unreasonable and both are supported by the record.

Thus, the Court will not grant habeas relief based on Ricks' argument that there was insufficient evidence presented at trial that he was the person who murdered Banks. *See* 28 U.S.C. § 2254(d).

### 2. Premedation

Ricks also argues that there was not sufficient evidence for the jury to the find that he committed Banks' murder with premeditation.

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 187 N.W.2d 434,

12

449 (Mich. Ct. App. 1971). Premeditation may "be inferred from all the facts and circumstances surrounding the incident, including the parties' prior relationship, the actions of the accused both before and after the crime, and the circumstances of the killing itself[.]" *Haywood*, 530 N.W.2d at 503. The type of weapon used, and the location of the wounds inflicted, may also be considered, *People v. Berry*, 497 N.W.2d 202, 204 (Mich. Ct. App. 1993), as well as the amount of time for the defendant to take a "second look" at his actions, *People v. Gonzalez*, 444 N.W.2d 228, 230 (Mich. Ct. App. 1989).

Starting with Ricks and Banks' prior relationship, the Michigan Court of Appeals found that "there was no evidence that defendant and the victim had a poor relationship or that there was any animosity between them." *Ricks*, 2018 WL 1768110, at *2. In fact, as the Court of Appeals noted, Ricks and Banks had traveled together to Detroit on a previous occasion, (ECF No. 8-9, PageID.376–77, 380 (Trial Tr. at 113–14, 117, (Oct. 13, 2016)), and Ricks testified that he loved Banks, (ECF No. 8-11, PageID.534–535 (Trial Tr. at 22–23 (Oct. 18, 2016))). The only evidence that could give rise to an inference of animosity is Mary's testimony that Ricks said that he could "come back home" after Banks' body had been found. (ECF No. 8-9, PageID.359 (Trial Tr. at 96 (Oct. 13, 2016)).) But, in all, the Michigan Court of Appeals reasonably concluded that Ricks' prior relationship with Banks was not a basis for finding premeditation.

Despite this seemingly good relationship, when the evidence is taken in the light most favorable to the prosecution, the Court of Appeals was reasonable in its

13

conclusion that a reasonable jury could find premeditation. Mary testified that it was unusual that she had not heard from her father for a couple of days because "[h]e's a person that basically had his time schedule set. It's a certain time that he's going to go to bed. It's a certain time he's going to eat." (ECF No. 8-9, PageID.343 (Trial Tr. at 80 (Oct. 13, 2016)).) Banks also said her father was retired, but he was trying to find work as a retiree. (*Id.* at PageID.344 (Trial Tr. at 81 (Oct. 13, 2016)).) So the jury could reasonably infer that Banks was not typically the type of person to take out-of-state trips without informing his family, and that perhaps Ricks had a hand in why Banks was in New York and later Detroit.

Mary also testified that Ricks had not initially been forthcoming about taking her father to the BoltBus, even though Ricks himself testified that he and Banks had traveled together on the bus to New York. (*See* ECF No. 8-9, PageID.339–340 (Trial Tr. at 76–77 (Oct. 13, 2016)); ECF No. 8-11, PageID.529 (Trial Tr. at 17 (Oct. 18, 2016)).) From this testimony, a jury could infer that Ricks may have persuaded or deceived Banks into traveling with him to New York and later Detroit, or at the very least, that he wanted to conceal their trip from Mary. And, according to Mary, Ricks provided her with various conflicting stories of what he knew about Banks' location, which could indicate that he had a plan to lure Banks to Detroit before he murdered him and attempted to hide that from Mary. From this too, a jury could infer that Ricks had given a second thought to his actions.

The location of the body could also lead to an inference of premeditation. Banks was found in an abandoned lot in a city where he did not live. The record does not

14

provide any evidence of why Banks would be in Detroit, except that he had previously gone to Detroit with Ricks. At this time, however, his daughter was back in Baltimore, making it less clear why Banks would have traveled to Detroit. The Court of Appeals found that a body found in a remote, concealed location could indicate either "the victim was lured to that location and murdered there, or that the perpetrator dumped the body there in an attempt to cover up the crime." *Ricks*, 2018 WL 1768110, at *2. And Ricks' cell phone data puts him with Banks in New York right before Banks' cell phone died, and near Banks' body in Detroit. (ECF No. 8-10, PageID.469–470 (Trial Tr. at 79–80 (Oct. 17, 2016)).) These two pieces of evidence could indicate to a jury that Banks was able to think about his actions before he murdered Banks and either intentionally lured him to an abandoned area of Detroit to murder him or had a plan to hide the evidence of the murder.

The Court of Appeals also noted that Banks had been stabbed 25 times, and though the brutality of a killing alone is not enough to establish premeditation, it could weigh in favor of premeditation on these facts. *Ricks*, 2018 WL 1768110, at *2; *see also People v. Oros*, 917 N.W.2d 559, 569–570 (Mich. 2018). In other words, not only could Ricks have thought about murdering Banks during their travels from Baltimore to New York to Detroit, but even if he did not, he would have had time to consider his actions during the stabbing itself. Banks was not murdered, for example, by a single bullet that might have been accidentally shot. Instead, he was stabbed over and over again, which indicates some time for the perpetrator to think about their actions. The medical examiner, moreover, testified that "[a]ll the stab wounds

15

went through the skin [and] the underlying soft tissue which includes the muscle." (ECF No. 8-9, PageID.279 (Trial Tr. at 16 (Oct. 13, 2016)).) The location and depth of the stab wounds support the inference that Ricks thought about, measured, and evaluated his options to maximize the harm to Banks. *See Oros*, 917 N.W.2d at 569 ("Given the amount of effort expended for these particular stab wounds, it was reasonable for the jury to infer that sufficient time existed between each stab wound to allow defendant the opportunity to take a second look.").

Taking the record in the light most favorable to the prosecution, the Michigan Court of Appeals did not unreasonably apply *Jackson v. Virginia* in finding that the jury had sufficient evidence to find premeditation. So § 2254(d) bars relief based on the claim that there was insufficient evidence of premeditation.

### III.

In sum, given the deference due to the jury's verdict and to the Michigan Court of Appeals' ruling, the Court DENIES the petition for a writ of habeas corpus.

SO ORDERED.

Dated: March 21, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

16